STATE

v.

Scott BROWN.

No. 2004–263–C.A.

Supreme Court of Rhode Island.

June 23, 2006.

Virginia M. McGinn, Esq., Providence, for Plaintiff.

Paula Rosin, Esq., Providence, for Defendant.

Present: WILLIAMS, C.J., and GOLDBERG, FLAHERTY, SUTTELL, and ROBINSON, JJ.

## OPINION

Chief Justice WILLIAMS, for the Court.

The defendant, Scott Brown (defendant), was convicted in the Superior Court of one count of felony assault in violation of G.L. 1956 § 11–5–2 and G.L.1956 § 12–29–2 and two counts of simple assault in violation of § 11–5–3 and § 12–29–2. The defendant appeals his convictions, alleging that the trial justice erred when he permitted the state to present evidence of prior uncharged acts of domestic violence perpetrated by defendant against the same complaining witness, Lorene Quaranta (Quaranta). The defendant and Quaranta, who were romantically involved, lived together at the time of all the incidents in question. For the reasons discussed herein, we affirm the judgment of the Superior Court.

### I

### Facts and Travel

The defendant was approximately seventeen years old when he and his family moved to the apartment above Quaranta's in West Warwick. Quaranta testified that

her friendship with defendant turned romantic in February 2002, when defendant was eighteen. The defendant eventually moved downstairs to live in Quaranta's apartment with Quaranta and her four children, one of whom had special needs requiring extensive care. For the first few months, their relationship progressed smoothly; Quaranta was happy with defendant, who had built a positive relationship with her four children.

At trial, Quaranta first testified about the history of her relationship with defendant, including two incidents of physical abuse that were not the basis of defendant's criminal charges. After Quaranta and defendant had lived together for a few months, defendant attempted to control her behavior in various ways, including criticizing the way she dressed and the level of care she gave to her disabled son, Jacob.[1] At some point in April 2002, defendant became angry when Jacob returned from school with evidence that he had not been properly cleaned after a diaper change. The defendant accused Quaranta of failing to clean her son, and punched her in the face three times in front of her children. On May 18 of that same year, when Quaranta and defendant were engaged in an argument over defendant's going to a strip club, defendant threw a porcelain unicorn at Quaranta's head, opening a gash that required a trip to the emergency room and "four to six" staples in her head. At the emergency care center, Quaranta told inquirers that she was dusting knickknacks when one of them fell and struck her in the head. Quaranta recalled that two different medical staff members attempted to inquire further about whether defendant, who accompanied her to the emergency care center, had actually been the cause of her injury. Quaranta did not reveal defendant's role at

that time. At trial, she explained that she lied to medical staff because she loved defendant and did not want him to get in trouble.

Directly following Quaranta's testimony as to these events, the trial justice, after a bench conference, issued a limiting instruction to the jury regarding the uncharged incidents. After clarifying which incidents were charged and which were not, the trial justice instructed the jury, in pertinent part, as follows:

"Now, I am going to instruct you, ladies and gentlemen, that first of all it is up to you whether or not to believe this testimony, just like any other testimony in whole or in part, or give it any weight whatsoever. But if you do give it some weight or believe it, either in whole or in part, this testimony is not evidence of the fact or proof of the fact that the defendant is likely to have committed the offenses with which he is charged, just because he allegedly committed this prior bad act or this uncharged misconduct, as we refer to it. It is only being offered to you, ladies and gentlemen, under what is called an exception to the rule that you cannot prove somebody's propensity to commit a crime by evidence of prior bad acts, uncharged bad acts. And that is to show, really, that there was a modus operandi, or a plan, or a scheme involving conduct of this defendant, and it is only being offered to you in that regard and for that very limited purpose, and not, again, as testimony or as evidence that the defendant must have committed these acts with which he is charged because he allegedly committed a prior bad act."

Quaranta then proceeded to describe in detail the charged assaults. She testified that on the morning of September 27,

---

1. This name is fictitious.

2002, after her children had left for school, she planned to leave the house to have notarized a medical form regarding Jacob's condition to ensure that her electricity was not turned off. When Quaranta told defendant what she was going to do, he began arguing with her about the fact that they had other plans. Quaranta said that she had only two days left to get the documentation she needed to prevent the electric company from turning off her service; defendant, in turn, called Quaranta a variety of profane names and then hit her in the face, knocking her to the floor. Quaranta, her nose bleeding, stood up and slapped defendant across the face, which she said was the first time she had hit him, and she did it because she felt she "was done" with the relationship. The defendant grabbed Quaranta's arm and "flipped [her] over him," causing her to hit the refrigerator and cabinets. Quaranta believed her arm had been dislocated. The altercation continued, with defendant following Quaranta around the apartment. At one point, defendant choked Quaranta. When the altercation moved to their bedroom, he struck her with a belt. Quaranta was treated at a hospital for a broken arm; again, she offered medical staff a fictitious cause for her injury.

Quaranta testified about the events giving rise to the other charge. She said that on October 3, 2002, her birthday, she and defendant planned to spend the evening at home together. They ordered a pizza, but when it arrived, defendant hit Quaranta upon discovering that the pizza did not have the deep crust he had requested. The fight continued, with defendant grabbing Quaranta by the throat, dropping her to the floor, and then punching her. Three of Quaranta's children witnessed these events. The defendant then left their apartment. Seeking help moving defendant out of her house, Quaranta went to the home of her neighbor, Holly Robidou. Holly Robidou's husband, James Robidou, went to Quaranta's apartment to watch her children, all four of whom were then at home. Quaranta called 9–1–1 to report that she had been assaulted; while on the phone with the operator, Quaranta heard defendant shouting and cursing outside and realized he had returned.[2]

Holly Robidou testified briefly that she and her husband were engaged in a group altercation outside Quaranta's house, which began when defendant returned home and threw a cake into the driveway. Quaranta testified that Holly Robidou challenged defendant to strike her instead of Quaranta; when it seemed that he would comply, James Robidou left Quaranta's apartment and inserted himself between defendant and Holly Robidou. Eventually, the police arrived at Quaranta's home in West Warwick and intervened in the argument, which was occurring outdoors.

The defendant testified that he never intended to hurt Quaranta. He stated that Quaranta's injuries resulted variously from "rough sex" and the fact that she was "clumsy." The defendant explained Quaranta's broken arm as the result of defendant's throwing Quaranta off him after she jumped onto his back. He denied injuring her on October 3, stating that Quaranta was angry that he had not bought her a birthday present, and, as a result, he left

---

2. Quaranta's thirteen-year-old daughter, Jessica (not her real name), also testified about the events she witnessed that night. She stated that she observed defendant cursing at and striking her mother, and that at first she found this sort of behavior so typical that she continued to sit at the dining room table completing her homework—she had become accustomed to the violence. When the argument grew more violent, however, Jessica became frightened.

the apartment to buy her a cake. Upon returning and seeing that Quaranta's daughter, Jessica, was packing defendant's things as if to move him out of the apartment, he became enraged and threw the birthday cake into the driveway.

Donald Archibald (Archibald), a West Warwick patrolman, testified that he was sent to Quaranta's address shortly after 6 p.m. on the night of October 3, 2002. When he arrived, he found a group of people arguing outside the residence: Quaranta, defendant, defendant's brother, and the Robidous. Archibald and two other officers separated the warring factions and spoke with them separately. Archibald observed that Quaranta had "several bruises" on her arms and face that appeared to be a few days old, recent redness around her throat, and a large bandage covering her arm from shoulder to wrist. At this point, Quaranta told Archibald that defendant had broken her arm the week before, and that there had been a physical altercation on the night in question, as well. Archibald then spoke with the Robidous, who confirmed Quaranta's version of the events that had occurred that night prior to the police intervention.

The defendant was arrested and charged by criminal information with one count of felony assault in violation of § 11–5–2 and § 12–29–2, and three counts of simple assault in violation of § 11–5–3 and § 12–29–2. One assault charge stemmed from the events of October 3, 2002; the other three charges all were alleged to have occurred on September 27, 2002.

The state filed a motion *in limine* seeking to admit evidence of prior acts of domestic violence that defendant had committed against Quaranta. At the hearing

on the motion, the state requested permission from the trial justice to present evidence of three separate uncharged incidents, each taking place on a different date in 2002: the incident when defendant struck Quaranta for not properly changing her son's diaper; another incident in which defendant hit Quaranta in the head with a porcelain figurine; and a separate altercation during which defendant kicked and punched Quaranta.[3] The trial justice ruled in favor of the state on this motion.

The subsequent jury trial produced a verdict of guilty of felony assault, guilty of two counts of simple assault, and not guilty of the third simple assault count. The trial justice entered a judgment of conviction on those three counts. The defendant was sentenced to fifteen years for felony assault, with five years to serve and the remainder suspended, with probation; additionally, on the two counts of simple assault, defendant was sentenced to two one-year sentences, all the sentences to run concurrently. The defendant filed a notice of appeal.

## II

### Analysis

■ The defendant argues on appeal that the evidence of prior, uncharged assaults that he perpetrated on Quaranta was inadmissible under Rules 403 and 404(b) of the Rhode Island Rules of Evidence. "[T]he admissibility of evidence is within the sound discretion of the trial justice, and this Court will not interfere with the trial justice's decision unless a clear abuse of discretion is apparent." *State v. Mohapatra,* 880 A.2d 802, 805 (R.I.2005) (quoting *State v. Grayhurst,* 852

---

**3.** The state's motion *in limine* requested permission to present evidence of three uncharged incidents of domestic abuse, each occurring on a different date. The record reveals that the third uncharged incident—an altercation in which defendant kicked and punched Quaranta—was never explored during trial.

A.2d 491, 504 (R.I.2004)). "It is well settled law both that evidence of a defendant's bad character or criminal disposition may not be admitted to prove his or her propensity to commit crime, and that several important exceptions exist alongside this principle." *State v. Baptista,* 894 A.2d 911, 914–15 (R.I.2006).

Rule 404(b) states that:

"Evidence of other crimes, wrongs, or acts is not admissible to prove the character of a person in order to show that the person acted in conformity therewith. It may, however, be admissible for other purposes, such as proof of motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident, or to prove that defendant feared imminent bodily harm and that the fear was reasonable."

Rule 403 reads:

"Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, waste of time, or needless presentation of cumulative evidence."

## A

### Rule 404(b)

The state requests first that this Court look to a Vermont Supreme Court case that created an exception to Rule 404(b) for domestic violence cases, in which evidence of uncharged prior domestic assaults were permissibly admitted to provide a "context" within which the jury could comprehend the charged act of domestic violence. The defendant, unsurprisingly, disagrees with the Vermont ruling's applicability to our case. The defendant argues that without applying the Vermont contextual exception, the prior uncharged conduct in this case does not fit into any of Rhode Island's recognized exceptions to Rule 404(b). The state, in turn, suggests that even without the contextual exception, defendant's prior conduct was admissible under various recognized exceptions to Rule 404(b), as determined by the trial justice.

We address the issue of exceptions to Rule 404(b) below. We begin with a discussion of the exceptions presently encoded in Rule 404(b) of the Rhode Island Rules of Evidence.

## 1

### Admissibility Under Rule 404(b)

■ The defendant on appeal alleges that the trial justice abused his discretion when he permitted the state to introduce evidence of the uncharged prior assaults because this evidence did not fit into any of the recognized exceptions to Rule 404(b). The line between Rule 404(b) evidence presented for the impermissible purpose of demonstrating propensity and Rule 404(b) evidence presented for one of the specific non-propensity exceptions is "both a fine one to draw and an even more difficult one for judges and juries to follow." *State v. Garcia,* 743 A.2d 1038, 1052 (R.I.2000). "In cases * * * in which the evidence in question can be used for multiple purposes, some of which are permissible and others of which are not, the trial justice should issue specific instructions to the jury explaining 'the limited purpose [or purposes] for which the jury may consider it.' " *Id.*

At the hearing on the state's motion *in limine,* the trial justice granted the motion, ruling that this evidence was admissible as proper non-propensity evidence to be used to shed light on the parties' history and to protect Quaranta's credibility. On appeal, defendant argues that there is

no Rule 404(b) exception for bolstering a witness's credibility. The defendant argues in the alternative that evidence of his prior uncharged conduct should not have been admitted, and the jury should not have been permitted to consider it, pursuant to the Rule 404(b) exception for common schemes or plans.

■ "This court on appeal is free to affirm a ruling on grounds other than those stated by the lower-court judge." *State v. Nordstrom*, 529 A.2d 107, 111 (R.I.1987); *see also State v. Froais*, 653 A.2d 735, 738 (R.I.1995) (affirming a trial justice's ruling on different grounds because "we have long upheld a trial justice's decision in various contexts even though the specific grounds relied upon by the justice were erroneous"). Therefore, instead of reviewing each reason the trial justice offered for admitting the prior uncharged acts into evidence, we turn to the Rule 404(b) exceptions, and we uphold the trial justice's ruling on one of his stated grounds—proof of intent or lack of mistake.

When the trial justice issued his final jury instructions, he advised the jurors that if they considered the prior, uncharged acts of assault to which Quaranta testified, those acts should be considered as evidence of intent—qualified under Rule 404(b) as evidence of "intent" or "absence of mistake or accident."

■ "[E]vidence of other conduct, even of a criminal nature, may be received if it is interwoven with the current charge in a way that tends to establish 'guilty knowledge, intent, motive * * * or the like.'" *State v. John*, 881 A.2d 920, 926, 927 (R.I.2005) (holding that evidence of a "defendant's violation of earlier no-contact orders tended to prove that defendant had the requisite intent with respect to" the specific violation of a no-contact order with which he was charged). Rule 404(b) evi-

dence may be admissible as proof of intent or absence of mistake or accident, in which case "admitting the evidence allows 'a trier of fact to hear a complete and, it is to be hoped, coherent story so as to make an accurate determination of guilt or innocence.'" *State v. Parkhurst*, 706 A.2d 412, 424 (R.I.1998) (quoting *State v. Gomes*, 690 A.2d 310, 316 (R.I.1997)).

The basis of defendant's defense was a lack of intent to hurt Quaranta. The defendant argued, first in his opening statement and then in more detail during his direct and cross-examinations, that he never intended to hurt Quaranta, and that any injuries she suffered were either accidental or self-inflicted. The admission of evidence that defendant had assaulted Quaranta on previous occasions and had engaged in an escalating pattern of domestic violence tended to establish defendant's intent to harm Quaranta on the two occasions for which he was standing trial.

■ The defendant now argues on appeal that even if the uncharged acts were relevant for the purpose of proving his intent, the way in which the evidence was admitted constitutes abuse of discretion because it was admitted in the state's case-in-chief, by the state's first witness—Quaranta—before defendant had testified and or elicited any information on cross-examination. The defendant cites our decision in *Parkhurst*, as well as an Indiana case to support the position that a defendant must open the door before the state may submit Rule 404(b) evidence pursuant to the intent exception.

The defendant alleged the following in his opening statement:

"[T]he injury to her arm, the evidence will show, was absolutely, definitely not the result of a criminal assault by [defendant]. *He had no intention of hurting her.* It lawfully, reasonably hap-

pened in the midst of an argument, and *the injury to her arm was a result of her grabbing him on the shoulder when he was trying to leave.* He shrugged her off. *She fell, broke her arm, hurt herself,* bruised herself and broke her arm." (Emphases added.)

The defendant's trial strategy was evident from this opening statement, in which he stated directly that he had no intention of hurting Quaranta, and that her injury was self-induced when she fell. Neither case offered by defendant to support this proposition suggests that an opening statement is insufficient to prompt the admission of Rule 404(b) evidence on the topic of intent.[4] In *Parkhurst,* the defendant in a first-degree murder trial claimed that the death had been accidental due to intoxication; following his conviction, he appealed to this Court, arguing, *inter alia,* that the trial justice committed reversible error when he permitted the state to present evidence of the defendant's involvement in another robbery to negate the defense of accident—before the defendant had presented his case to the jury. *Parkhurst,* 706 A.2d at 423–24. We disagreed, and held that defense counsel had in fact raised the pertinent issue leading to the admission of the Rule 404(b) evidence before presenting defendant's case to the jury by asking questions on cross-examination of state witnesses designed to elicit testimony about the defendant's intoxication at the time of the murder, *Parkhurst,* 706 A.2d at 425;

therefore, "[p]lainly defense counsel raised the issue of intoxication before presenting defendant's case to the jury," *id.* at 424.

We disagree with defendant's argument that *Parkhurst* precludes the presentation of intent-related Rule 404(b) evidence until a defendant has engaged in cross-examination or presented his or her case-in-chief. In *Parkhurst,* 706 A.2d at 424–25, we affirmed the trial justice's decision to admit intent evidence before the defendant had presented his case, to rebut a claim of accident. In this case, defendant opened the door by declaring to the jury in his opening statement that Quaranta's injuries resulted from an accident and that defendant never intended to hurt her. Our holding in *Parkhurst* in no way requires this Court to hold that the Rule 404(b) evidence presented to prove defendant's intent and negate his claim of accident was offered prematurely.

Neither does the Indiana case that defendant cited stand for a proposition that would result in reversible error in this case. On the contrary, that case specifically names the opening statement among the acceptable ways in which a defendant may open himself up to contrary Rule 404(b) evidence:

"When a defendant alleges in trial a particular contrary intent, *whether in opening statement,* by cross-examination of the State's witnesses, or by presentation of his own case-in-chief, the State may respond by offering evidence of pri-

---

**4.** We are likewise not persuaded by defendant's argument that he would not have raised the defense of intent in his opening statement if the trial justice had not already ruled against him in the motion *in limine.* We disagree that defendant's course of action was set in stone following the trial justice's ruling on the motion *in limine.* "A motion *in limine* is inherently conditional." *State v. Carvalho,* 892 A.2d 140, 146 (R.I.2006). In almost all instances, "[t]he preliminary grant or denial of an *in limine* motion 'need not be taken as a final determination of the admissibility of the evidence referred to in the motion.'" *State v. Torres,* 787 A.2d 1214, 1220 (R.I.2002). *But see State v. Andujar,* 899 A.2d 1209, 1222 (R.I.2006) (holding that the ruling on the motion *in limine* in that case was unequivocally definitive); *State v. Gomes,* 881 A.2d 97, 108 (R.I.2005) (stating that under certain circumstances, an *in limine* ruling may be considered "clearly *definitive* ").

or crimes, wrongs, or acts to the extent genuinely relevant to prove the defendant's intent at the time of the charged offense." *Wickizer v. State*, 626 N.E.2d 795, 799 (Ind.1993) (emphasis added).[5]

By the time Quaranta began testifying on direct examination, the jury had already heard defendant's argument that he had no intention of hurting Quaranta and that her injury was essentially a mistake caused by Quaranta's grabbing defendant and then falling down and breaking her own arm. The defendant did, in fact, open the door to this testimony, and therefore evidence of the prior, uncharged assaults perpetrated by defendant against Quaranta was properly admitted to prove intent and lack of mistake under Rule 404(b). We hold that the trial justice did not abuse his discretion by permitting the admission of this evidence.

2

**The Domestic Violence Contextual Exception**

The state invites this Court to adopt the Vermont Supreme Court's holding that prior, uncharged acts of domestic violence are admissible in the trial court based not on the standard exceptions to the rules of evidence, but because evidence of these prior assaults is necessary in cases of domestic violence to demonstrate the context in which the charged assault occurred. Having held that the trial justice properly admitted the evidence pursuant to the intent/lack of mistake exception to Rule 404(b), we decline to address or adopt Vermont's contextual evidence exception.

B

**Admissibility Under Rule 403**

The defendant next argues that, even if we hold that the trial justice acted permissibly within the confines of Rule 404(b) when he admitted evidence of prior uncharged assaults, we should nevertheless reverse defendant's convictions based on Rule 403's proscription of evidence the relevance of which is "substantially outweighed by the danger of unfair prejudice" and by the potential for "confusion of the issues" by the jury. R.I. R. Evid. 403. The defendant contends specifically that the level of detail to which the state's witnesses testified to the uncharged events, especially during her testimony regarding the unicorn-throwing incident, must have led the jury to confuse the issues at trial. The defendant cites our decision in *State v. Jalette*, 119 R.I. 614, 627–28 382 A.2d 526, 533–34 (1978), in which we permitted testimony of a prior, uncharged act of sexual molestation, and specified several caveats to be observed by the state when presenting evidence of prior, uncharged sexual acts. Among other rules, we said that: "A witness should not be questioned about the details of the accused's other misbehavior * * *. In this sensitive area of the law, the trial court can do much to strike a proper balance." *Id.* at 628, 382 A.2d at 533–34.

A literal reading of the above passage, as defendant argues, would seem to suggest that a witness offering Rule 404(b) evidence could not be questioned at all; since any testimony on the topic would provide "details of the accused's other misbehavior." Such an interpretation makes little sense. We look instead to the level of detail adduced at trial, and we disagree

**5.** The Indiana case cited by defendant, *Wickizer v. State*, 626 N.E.2d 795, 800 (Ind.1993), stands for the limited proposition that a defendant's statement to the police alone will not be considered to allege a contrary intent for the purposes of introducing evidence pursuant to the intent exception to Rule 404(b) of the Indiana Rules of Evidence.

with defendant's assessment of the testimony in this case as overly detailed. Compared with Quaranta's testimony regarding the charged incidents, her testimony on the uncharged incidents was far less detailed and much more succinct. The record reflects that Quaranta testified considerably more extensively and more expansively about the charged incidents. As an additional protection against jury confusion, the trial justice's instructions to the jury directly following Quaranta's testimony on the uncharged incidents made very clear the distinction between charged and uncharged offenses and the permissible and impermissible ways the jury could treat the different types of information. *Jalette*, furthermore, is inapplicable as it is limited to evidence of uncharged acts of *sexual* misconduct. *See Jalette*, 119 R.I. at 627, 382 A.2d at 533.

We believe that the level of detail adduced at trial regarding the uncharged incidents was not excessive, and the jury instructions, timed as they were directly after the testimony of the uncharged incidents and before the testimony of the charged incidents, served to cure any confusion that might have resulted from the somewhat detailed descriptions of the uncharged offenses. In addition, as we have stated regarding permissibly admitted non-propensity character evidence: "The mere fact that such evidence is prejudicial to a defendant does not render it inadmissible." *Parkhurst*, 706 A.2d at 424.

Therefore, the trial justice did not abuse his discretion under Rule 403 when he permitted trial testimony regarding uncharged incidents of domestic assaults perpetrated by the defendant against Quaranta.

### Conclusion

For the reasons discussed in this opinion, we affirm the judgment rendered below. The record in this case shall be returned to the Superior Court.